Loring, J.,
delivered the opinion of the court :
All the questions made in this case are on the construction of the contract; that is, in the usual form of transportation contracts ,• and though these have frequently been the subjects of litigation here, the precise questions now presented have not been before adjudicated here.
The petitioner claims that, under his contract, he was entitled to transport all the military stores and supplies sent by the United States in the year 1866 from and to the places within the district described in his contract; and he alleges that the United States, by employing Herman Kountze to transport in that year such military stores and supplies from and to places within that district, committed a breach of the contract.
The United States deny the claim of the petitioner, and contend that, under his contract, he was entitled to transport only such military stores and supplies as they required to be sent by wagon transportation from the places specified and described in the contract; and they allege that no wagon transportation was required or employed by them from such places, and that, therefore, there was no breach of the contract.
The questions thus raised are to be determined by ascertaining the legal intent of the contract. And the legal intent of a contract is what the parties were mutually bound to understand from its terms, construed with reference to its subject-matter and the circumstances in which it was made.
The terms of the contract are as follows :
" Article 1. The said Caldwell shall receive at any time in any of the months from April to September, inclusive, during the year 1866, from the officers or agents of the Quartermaster Department at Forts Leavenworth and Riley, in Kansas; at Fort Kearney, Nebraska Territory; Fort Sedgwick, Colorado Territory; Fort Laramie, Dakota Territory, and at any points or places at which posts or depots shall be established during *341 tbe continuance of this contract on the west bank of the Missouri Biver, north of Fort Leavenworth and south of latitude 44° north, all such military stores and supplies as may be offered or turned over to him for transportation, in good order and condition, at any or all of the above points or places, and transport them, in like good order and condition, to the officer or agent of the Quartermaster’s Department on duty, or designated to receive them, ” &e.
And the "second article of the contract is as follows :
“ Article 2. That the said Alexander Caldwell agrees and binds himself, his heirs, executors, and administrators, to transport, under this agreement, from the posts, depots, or stations named in Article 1, or from and to any other posts, depots, or stations that may be established within the district named in said article, any number of pounds of military stores and supplies, from and between one hundred thousand pounds and ten millions of pounds in the aggregate.”
And while the covenants by the petitioner are so full and express, to transport all the military stores and supplies that shall be offered to him, within the maximum of ten millions of pounds, there is not in the contract any express covenant or agreement on the part of the United States to offer him for transportation any military stores or supplies whatever. The contract in this respect is therefore in its form unilateral, and the question is whether and how far it is to be modified by considerations of its subject-matter and the circumstances in which it was made.
The subject-matter of the contract is the supply and maintenance of the military posts in the western wilderness, and the circumstances in which it was made are, the absolute necessity of transportation, and of a quantity sufficient for the purpose contemplated, and the outlay the petitioner must make for the means of and arrangements for the service before he could receive anything under the contract; and the parties to the contract knew all these things and their effect on each other.
The circumstances offered to the contractor certainty of employment, and to such an extent as would make his undertaking remunerative; but these advantages of and inducements to the contract depended entirely on the fact that the transportation should be given to him; so that that fact made the whole yalue of the contract to him, and his only motive for entering into it. And the United States knew this, and had therefore *342 no right to assume, and could not have believed, that the contractor intended or would have agreed to take upon himself the heavy and costly burdens of the contract, and make the expenditures of money and labor, a preparation for its continuous service required, and yet leave it to be determined afterward by any quartermaster’s notions of expediency, or by his pleasure or caprice, whether the contract should be performed or defeated, or made profitable or ruinous to him who had undertaken it.
And the law draws no such conclusion; for where one party to a contract knows that his action under it involves not only the whole consideration to be received, but also a large preparatory outlay made by the other party, the former knows that the other party’s preparatory expenditure under the contract is to be so much paid in advance for his own action under it, like a part prepayment for a chattel sold; and the law holds him to the bargain in the one case for the same reason that it does in the other. A consideration rendered implies its equivalent, and therefore the law, in construing a contract like this, from the express obligation of the one party implies the duty of the other, and thus gives to the contract that mutuality which is absolutely necessary to its equity.
In the case of the United States v. Speed, (7 C. Cls. R., p. 93,) the action was on a contract for packing hogs to be furnished by the United States, and the breach alleged was, that the United States hadnot furnished the'hogs; and it was contended in defense that, by the terms of the contract, the United States were not bound to furnish any given number of hogs. As to this the Supreme Court said as follows:
“Without entering into a discussion of the general doctrine of the implication of mutual covenants, we deem it sufficient to say 'that where, as in this case, the obligation of the plaintiffs requires the expenditure of a large sum in preparation to enable them to perform it, and a continuous readiness to perform, the the law implies a duty in the other party to do whatever is necessary for him to do to enable the plaintiffs to comply with their promise or covenant.”
We think this decision makes the rule of law for this case, and on its authority we hold that, by the legal intendment of the contract, the petitioner was entitled to, and it was the duty of the United States to offer to him, the transportation oí *343 all the military stores and supplies sent by them, in. the time and from and to the places within the district specified in the contract.
It is observable, that neither the contract nor the circumstances in which it was made furnish any rule or suggest any reason for dividing the transportation or limiting the duty of the United States to the offer of any part less than the whole of it.. So that, if the legal intent of the contract entitles the petitioner to any transportation, it entitles him to all used by them within the time and district covered by the contract.
The next question is, what is the time covered by the contract? The first article provides as follows: “ Article 1. That the said Alexander Caldwell shall receive at any time, in any of the months from April to September, inclusive, during the year 1866,” &e., and then follow the provisions for transportation from and to the points of departure and delivery. Thus this article, by express stipulation, and by the rule “ expressio nnius est exclusio altering,” confines the transportation to be done to the months “ from April to September, inclusive,” and it is observable that the schedule annexed to the contract for the purpose of specifying in a tabular form its places and times of departure and prices, mentions only the month above named. And we think that the contract obliged the petitioner to receive and the United States to offer to him the military stores and supplies sent by them in those months, and those only; and that the contract was broken by the delivery to Herman Kountze of such stores and supplies in those months and no others, and for that reason we have measured the petitioner’s damages by the military stores and supplies transported by Kountze in those months and no others.
It may be that the parties expected that all the stores and supplies needed for the year would be transported in the months specified, in which the transportation could be best done. That would be a reason why the contract was made as we find it, but none for our departure from it.
But it was contended for the petitioner that, by the eleventh article, he was entitled to the transportation of all the military stores and supplies delivered by the United States for transportation within his district during the year 1866. The eleventh article.provides as follows, viz:
“ That the said Alexander Caldwell shall transport all the *344 military stores and supplies for which the Quartermaster’s Department may require wagon transportation by contract on the route specified by this agreement during the year 1888, provided the weight of such military stores and supplies shall not exceed in the aggregate ten millions of pounds,” &c.
We think this eleventh article is only a provision for additional transportation that may be required in other months than those above specified, and under another contract than this, to be made if and when such additional transportation should become necessary.
It is observable that this contract was made March 12,1866, and then the full amount of transportation that might be required for that year could not be certainly told; for transportation in other months than those specified might become necessary from circumstances or accidents that could not be foreseen. So that, without a provision for such additional transportation in other months, the arrangements for the year 1866 would not be complete. And such additional transportation would require another contract, for the price of transportation in the fall and winter months, from its greater difficulties, might require a different price from the single price specified in the contract for the spring and summer months named. And it is to be recollected that if the contract covered the year 1866, the United States would have the selection of its months for transportation, for they could offer it in any months of that year they pleased, and compel the contractor to carry the ten millions of pounds, in the difficulties and exposures of the winter months, for the same price that is fixed by article 1 for the spring and summer months named in it. This would be a ruinous hardship to the contractor, and we think, that the specification of the months in the first article and in the tabular schedule is made to exclude it, and to confine the transportation to be done for the price specified to the months specified.
And we think this is indicated by the words used in the eleventh article. The words are, “ for which the quartermaster may require wagon transportation by contract.” It is manifest that the transportation which the eleventh article refers to is to be under a contract, and the words “ may require,” of their own force, indicate a future contract. For a contract which a man “ may require” cannot denote a contract already existing.
And the last clause of the eleventh article is as follows: “ Yet *345 nothing herein contained shall be so construed as to forbid or prevent the United States from using its own means of transportation for such service, whenever it may be deemed advisable to do so.’7 And this provision is made because the additional transportation might only be required from one fort to another or between neighboring places; and for such transportation the horses and wagons always attached to forts might be sufficient, while for transportation of millions of pounds for the whole of a route, reaching to nearly a thousand miles, they would be entirely insufficient. And they are never used for such a purpose; so that the clause cited shows that the eleventh article relates to other transportation than that provided for in the first and second articles.
The defense made to this action by the United States was that by the express terms of the contract the petitioner was entitled only to the wagon transportation used by the United States from points of departure on the Missouri River; and that Columbus, Lone Tree, and Kearney Station, at which stores and supplies were delivered to Kountze, were progressive termini of the railroad and were not within the petitioner’s contract.' As to this, the first article provides that the petitioner shall receive military stores, and supplies at certain forts named, “ and at any points or places at which posts or depots may be established, during the continuance of this contract, on the west bank of the Missouri River."
And it was contended that, as this contract was made by military authority, and related to military affairs, the words “posts and depots” were to be construed in their strictly military sense, and as they are used in the Army Regulations, and thus be confined to military posts and depots. But the words posts and depots are not exclusively military words, nor exclusively so used ; and it is observable that, in contracts made by military authority and in relation to military affairs, as in the contracts made with Herman Kountze, and in evidence in this case, where the intent is to confine the contract to military stations, it is so expressed in terms, and the words used are “ military posts.” And the words “posts and depots," in-their proper meaning, include any and all kinds of posts and depots; and we see no reason for restricting the convenience of the United States to only one class of posts and depots. Nor did the United States. For, as is shown by the evidence in the *346 case, they, under this contract, delivered military stores and supplies to the petitioner, at Nebraska City, for transportation thence by him, and he transported them to Fort Bridger and Camp Douglas, and the United States paid him for it; and Nebraska City is not, and is shown by the testimony not to have been, a military post or depot, but a place where the United States had collected and deposited stores for transportation. And this mutual action of the parties under the contract construes its words, “posts and depots,” conclusively between them, and in strict conformity with the rules of law; for, in a transportation contract, its terms are to be construed in reference to its purpose. And then, the words “ posts and depots” will include military or railroad depots and stations, or any other places where stores and supplies are collected and deposited for transportation, as was the case at Nebraska City, Columbus, Lone Tree, arid Kearney Station. All of these places are on the route and within the district covered by the petitioner’s contract, and we think they are within the operation of the contract, and within its words in its second article, viz: “From the posts, depots, or stations named in article 1, or from and to any other posts, depots, or stations that may be established within the district named in said article.”
It is true that Columbus, Lone Tree, and Kearney Station are not “ on the west bank of the Missouri River,” if those words mean the water-line of the'river. But we think they are not to be so confined, nor does the contract so confine them; • for its third article refers to points of departure as “ on or near the Missouri River and we think the phrase “ west bank of the Missouri River ” is used merely to denote the most easterly line of the district covered by the contract.
But however all this may be, and admitting that the words “posts and depots ” are to be construed in the strictly military sense for which thecounsel for the United States contended, then it is certain that Omaha was a military post and depot, for it was the military headquarters of the Department of the Platte, and it was literally “ on the west bank of the Missouri River,” and all the corn, to the transportation of which we have adjudged the petitioner to be entitled, was, after this contract was . made, and “from April to September, inclusive, in the year 1866,” collected by the United States at Omaha, and sent thence by them over the route No. 1, to forts within the district de *347 scribed in the contract. Thus Omaha was a military post and depot within the contract, however its words are construed, and it was on the west bank of the Missouri Biver, and it was established as a post or depot during the contract by the United States, by the collection and deposit there of military stores and supplies, which were to be and were transported thence, in the months from April to September, inclusive, to forts within the district covered by the contract.
And it was a point of departure, within the contract, and it has been officially so declared; for, on the 30th of March, 1866, after the execution of the contract, an order was sent from the Quartermaster-General, at Washington, to Saint Louis, as instructions to General Easton, senior and supervising quartermaster of the military division of Mississippi, and by him sent to Omaha as instructions to General Myer, chief quartermaster of the Department of the Platte; and in that Order the Quartermaster-General instructed his subordinates, in reference to this contract, as follows:
“You will observe that the óontract on route No. 1 provides for any points of departure on the Missouri Biver below 42° north.
“ Whenever it shall be for the interest of the Government, Nebraska City, or Omaha City, or other places on the Missouri Biver, should be the points of departure for the wagon-trains.”
And General Myer, who was charged with the execution of this contract, in direct reference to performance under it, treated Omaha as a point of departure; for in May, 1866, at Saint Louis, Missouri, he informed the petitioner that large quantities of corn would be purchased and shipped from Omaha, and inquired of the petitioner if he would require the full notice, as the time mentioned in the contract, to be given, and the petitioner replied that he would do all in his power to comply with the orders given him ; and on all this evidence, we think that it is not to be questioned that Omaha was understood and intended by the parties to this contract to be a point of departure within it, and, geographically, and as a matter of fact, it certainly was within the district covered by the contract.
But the United States claimed that, notwithstanding the contract, they had the right to transport stores and supplies from Omaha to the progressive termini of the railroad as it advanced toward completion, and deliver them at such termini *348 to any one they pleased; and they offered evidence to show that they proposed to insert provisions for that purpose in the contract, which were not inserted, because the petitioner objected to them ; and that, at the execution of the contract, the petitioner was informed by officers of the Quartermaster’s Department that it would use such transportation by railroad. All this evidence was rejected for the reasons that the proposals and discussions that lead to and terminate in a written contract cannot be used to vary its express terms; and these, which are the final and mutual declarations of both parties, cannot be varied by parol evidence, nor by the declarations of either of the parties, made before, or at, or after the execution of the contract.
W e therefore must take the contract as it was executed, and we think there is nothing in it which reserves to the United States the right claimed for them; and if the decision of the Supreme Court which we have cited has been correctly applied to this contract, and because of the express obligations in it, on the part of the petitioner, it was the implied duty of the United States to offer him the transportation of the military stores and supplies sent by them, within the time and from and to the places wittiin the district covered by the contract, then the breach of the contract and the injury to the petitioner were the same, whether such transportation was given to the railroad or to another contractor, or parceled out between them.
It was contended by the United States that the petitioner had previously to this suit settled all his claims under this contract at the Treasury; but the only evidence of this was the payment to and the receipt by him of the money due him for transportation done by him from the city of Nebraska to Fort Bridger and Camp Douglas; and the receipt in terms confines the settlement made to that transportation, and it cannot be applied to anything else, for that, as the receipt shows, was all the parties intended to act upon. The Third Auditor certifies that the voucher to the account “ appears to be the final payment under the contract therein referred to;” but this must be taken to mean that it is the last payment made to the petitioner, so far as shown by the records of the Treasury, for that is all the Third Auditor could know, or that he was authorized to certify.
And a compromise at the Treasury cannot be presumed, for *349 the officers of the Treasury have no authority to make any. Their only authority is to pay what they find to be due; and they have no more right to pay less than they have to pay more. And a public officer’s payment of a sum to which he is limited by his official duty has none of the elements of a compromise, and can furnish no presumption of any; and the only presumption arising upon a settlement at the Treasury is that the payment was made and received as the amount found due by the accounting officer.